IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


DAWN L. POHL                                    PLAINTIFF


        v.                        CIVIL NO. 10-5170


MICHAEL J. ASTRUE, Commissioner
Social Security Administration                  DEFENDANT


## MEMORANDUM OPINION

        Plaintiff, Dawn L. Pohl, brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying her claims for a period of disability and disability insurance benefits

(DIB) and supplemental security income (SSI) under the provisions of Title II and Title XVI of

the Social Security Act (Act).  In this judicial review, the Court must determine whether there

is substantial evidence in the administrative record to support the Commissioner's decision.  See

42 U.S.C. § 405(g).

## I.      Procedural Background:

        Plaintiff protectively filed her current application for DIB on November 21, 2007,

alleging an inability to work since September 13, 2006, due to a broken leg and tail bone, a bad

knee, and back pain.  (Tr. 99-101, 119-29).  Plaintiff filed her current application for SSI on June

3, 2008. (Tr. 104-06).  An administrative hearing was held on May 6, 2009, at which Plaintiff

appeared with counsel and testified. (Tr. 7-43).

        By written decision dated November 5, 2009, the ALJ found Plaintiff was not under a

disability from September 13, 2006, through the date of the decision.  The ALJ found that during

the relevant time period, Plaintiff had an impairment or combination of impairments that was

severe, specifically a status post broken leg and a status post fractured tail bone.  However, after

reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not

meet or equal the level of severity of any impairment listed in the Listing of Impairments found

in Appendix I, Subpart P, Regulation No. 4. (Tr. 51).  The ALJ found that Plaintiff retained the

residual functional capacity (RFC) to:

> Lift and carry 10 pounds occasionally and less than 10 pounds frequently;
> [Plaintiff] can sit for about 6 hours during an eight-hour workday and can stand
> and walk for at least 2 hours during an eight-hour workday; the claimant can
> occasionally climb, balance, stoop, kneel, crouch, and crawl.

(Tr. 52-53).  With the help of a vocational expert, the ALJ determined that Plaintiff "is capable

of making a successful adjustment to other work that exists in significant numbers in the national

economy." (Tr. 54-55).  The ALJ noted that Plaintiff was capable of working as an assembler,

charge account clerk, and escort vehicle driver.  (Tr. 54).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which

considered subsequent evidence, and denied that request. (Tr. 1-4).  Subsequently, Plaintiff filed

this action. (Doc. 1).  This case is before the undersigned pursuant to the consent of the parties.

(Doc. 5).  Both parties have filed appeal briefs, and the case is now ready for decision. (Docs.

8, 9)

**II.    Evidence Presented**:

At the administrative hearing before the ALJ on May 6, 2009, Plaintiff testified that she

was thirty-six years of age, had obtained a GED, previously had a CNA license, and had

-2-

secretarial training.  (Tr. 12,14).  The record reflects Plaintiff's past work consists of work as a tree cutter, a CNA, a cashier, and a dump truck driver. (Tr. 124, 140).

The medical evidence during the relevant time period of September 13, 2006 through November 5, 2009, reflects the following.

On September 13, 2006, Plaintiff was working cutting trees and slipped and fell on a walnut.  (Tr. 33-34).  Plaintiff thought she had just sprained her ankle, but after being taken to the emergency room at Northwest Medical Center in Springdale, Arkansas, realized that she had fractured her tibia and fibula.  (Tr. 189-92). As a result, Plaintiff received internal fixation[1] of the fractures and was placed in a long leg cast.  On September 14, 2006, the operating surgeon, Dr. Cyril Tony Raben, noted in a post-operative report that all of the implants were in good position, and generally the operation went well.  (Tr. 191-92).  Radiology reports reinforced the findings of Dr. Raben in the postoperative report. (Tr. 349-54)

On September 26, 2006, at a follow up exam, Dr. Raben indicated that "[Plaintiff] was doing well still, even after she had fallen the other day, with the exception of some cramping in her leg." (Tr. 334-38).  Plaintiff at this time was using crutches to ambulate.  (Tr. 334-38).

Plaintiff again saw Dr. Raben on September 29, 2006, and, after having a x-ray done on Plaintiff's right ankle on 09/28/2006, he opined that the x-ray showed "satisfactory position of the fracture fragments with good position of the mortise.  She has fallen today and is having an increase in her leg pain."  (Tr. 330-33, 360)

On October 1, 2006, x-rays of the Plaintiff's right lower leg were taken at Northwest Medical Center of Washington County, and were requested "to evaluate for possible presence

---

[1] Internal Fixation:  the open reduction and stabilization of fractured bony parts by direct fixation to one another with surgical wires, screws, pins, and plates. Dorland's Illustrated Medical Dictionary  721 (31st ed. 2007)

of a loose foreign body,[] inside the cast." (Tr. 357-58).  The x-rays showed no loose foreign

body inside the cast. (Tr. 357-58).

On October 7, 2006, Plaintiff was admitted into the emergency room at Northwest

Medical Center in Washington County after complaining of a sensation of rocks within the cast.[2]

(Tr. 180-88).  As a result, the cast was cut from her leg, and a new one was applied.  (Tr. 184).

Plaintiff experienced no discomfort after the new cast was applied, and no loose foreign bodies

were found within the cast. (Tr. 187).

On October 15, 2006, Plaintiff saw Dr. Gregory Jelinek for an evaluation of her ankle

fracture. (Tr. 359).  Dr. Jelinek opined that the right ankle showed internal fixation of tibial and

fibular fractures, and after comparing the current study to the previous one of 09/28/2006, no

significant interval change in position or alignment was seen.  (Tr. 359).

On October 16, 2006, Plaintiff visited Dr. Raben, complaining that her toes were turning

blue when she put her foot down.  (Tr. 321-24).  Dr. Raben indicated that Plaintiff was

constipated and depressed, and had a pain level of "8 out of 10." (Tr. 321-24).

On November 20, 2006, Plaintiff again visited Dr. Raben, complaining of right leg pain,

and stated that her pain level was a "5 out of 10."  (Tr. 318-20).  Dr. Raben opined that the

internal fixation appeared to be in adequate position, as indicated by the recently taken x-rays.

(Tr. 318-20).

On December 18, 2006, Plaintiff saw both Dr. Raben, and Dr. Jelinek at Washington

Regional Medical Center for separate appointments.  (Tr. 315, 361).  Plaintiff complained to Dr.

Raben of a "tight leg and lower back." (Tr. 315).  Dr. Raben opined that Plaintiff's cast was

---

[2]The Court notes that the emergency room records were somewhat illegible.

-4-

breaking down, and as a result he reinforced the heal of the cast.  (Tr. 315).  At this point, Plaintiff was still using crutches. (Tr. 315).  The impression given by Dr. Jelinek was a "healing fracture with no significant change in position." (Tr. 361).

On January 7, 2007, Plaintiff saw Dr. Barry Wetsell at Washington Regional Medical Center.  (Tr. 362).  Dr. Wetsell examined Plaintiff's ankle fracture, and opined that "[t]he sharpness of fracture margins are more obscured on this study suggesting a slight degree of healing." (Tr. 362).  The next day, when the long leg cast was replaced, Plaintiff complained of depression, as well as "pain on compression of the fracture fragments." (Tr. 312-14).  Medical records indicate that Plaintiff was still using crutches to ambulate.  (Tr. 312-14).

On February 2, 2007, Plaintiff saw Dr. Mark E. Moss at Washington Regional Medical Center for an examination of her right ankle.  (Tr. 363).  Dr. Moss stated that the fracture lines were still discernable, there had been no significant change as compared to the previous study taken on December 18, 2006, and that Plaintiff exhibited diffuse osteopenia.[3]

On February 12, 2007, when Plaintiff saw Dr. Raben, her long leg cast was removed and replaced with a short leg cast. (Tr. 309-11).  Dr. Raben indicated that the fracture lines appeared to be in good position, Plaintiff had "long leg cast toe touch gait," and she was becoming depressed about how long the healing process had taken.  (Tr. 309-11).

On February 20, 2007, Plaintiff was seen by Waymon Floyd, a physical therapist.  (305-08).  The record indicates that Plaintiff was anxious to begin the rehabilitation process, and

---

[3] Diffuse osteopenia: reduced bone mass due to a decrease in the rate of osteogenesis to the extent that there is insufficient compensation for normal bone lysis.  The term is also used to refer to any decrease in bone mass below normal.  Dorland's Illustrated Medical Dictionary 1369 (31st ed. 2007).

-5-

ultimately wanted to return to work trimming trees.  (Tr. 305-08).  Plaintiff was still using crutches.  (Tr. 306).  Mr. Floyd's assessment reads:

> Patient is demonstrating symptoms congruent with diagnosis including loss of functional hip and knee motion and strength and decreased weight bearing/gait performance all contributing to decreased functional performance with work activities, [and] recreational activities . . . .  She will have obvious reduction of her ankle range of motion and strength but [it] can not [sic] be assessed at this time.

(Tr. 307).

On March 12, 2007, Plaintiff was seen by Dr. Robert L. Morris at Washington Regional Medical Center regarding x-rays taken of her right ankle.  (Tr. 364).  Dr. Morris indicated that the fracture lines were still clearly identifiable in the distal tibia, and there had been no significant change since 01/07/07, but that the fibular lines were no longer identifiable.  On this same date, Plaintiff had an appointment with Dr. Raben, who indicated that Plaintiff was having a lot more joint line pain, especially in the medial posterior joint, and Plaintiff had a lag in her knee extension.  (Tr. 298-300).  Dr. Raben diagnosed the symptoms as indicative of the original fracture of her ankle, as well as a knee tear of the medial meniscus.  (Tr. 298).  As a result, a magnetic resonance imaging (MRI) of Plaintiff's knee was ordered.  (Tr. 300).

On March 16, 2007, Plaintiff underwent a MRI of her right knee by Dr. James Wise at Fayetteville MRI.  (Tr. 213, 365).  Dr. Wise found osteochondritis[4] desiccans[5] [sic], and subchondral bone edema[6] consistent with grade IV chondromalacia[7].  (Tr. 213, 365).  There were no significant abnormalities of the menisci, and ligaments.  (Tr. 213, 365).

---

[4]Osteochondritis: inflammation of both bone and cartilage.  Id. at 1366.
[5]Osteochondritis dissecans: osteochondritis resulting in the splitting of pieces of cartilage into the joint, particularly the knee joint or shoulder joint.  Id.
[6]Subchondral bone edema: the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body.  Id. at 600.
[7]Chondromalacia: softening of the articular cartilage, most frequently of the patella.  Id. at 358.

On April 9, 2007, Plaintiff met with Dr. Raben for a follow-up regarding the March 16, 2007 MRI showing a "osteochondral fracture or osteochondral defect about the femoral condyles." (Tr. 284-86). The Plaintiff was still using crutches, but measured her leg pain as a "1 out of 10." (Tr. 284). Dr. Raben noted that the Plaintiff's gait was "crutch walking." (Tr. 286).

On April 20, 2007, Plaintiff saw Dr. B. Raye Mitchell at Ozark Orthopaedics, and Plaintiff complained that she could not straighten her right knee, which had a flexion contracture of about twenty-five degrees. He noted the MRI taken on March 16, 2007 showed a "small focus of non-displaced avascular necrosis"[8] and bone bruising. (Tr. 210). Dr. Mitchell disagreed that the MRI showed chondromalacia. (Tr. 210). He thought it was a combination of bone bruising and disuse osteoporosis.[9] (Tr. 210).

On May 21, 2007, Plaintiff met with Dr. Raben complaining of leg pain, giving the level of pain an "8 out of 10." (Tr. 275-77). Dr. Raben noted that Plaintiff's gait appeared normal, although Plaintiff appeared in mild distress. (Tr. 275-77). The next day, Plaintiff met with Dr. Mitchell, who opined that Plaintiff was making great progress, and was down to using one crutch to ambulate instead of two. (Tr. 209).

On June 22, 2007, Plaintiff met with Dr. Matthew J. Coker at Ozark Orthopaedics. (Tr. 207). Plaintiff complained that her knee was clicking a little bit and caused some pain, but no locking of the knee had occurred, and the pain had been the same since the long leg cast was

---

[8]Avascular necrosis: the sum of the morphological changes indicative of cell death and caused by the progressive degradative action of enzymes. Id. at 1254.
[9]Disuse osteoporosis: decrease in bone substance as a result of lack of re-formation of laminae in the absence of functional stress that ordinarily leads to their replacement in new stress lines. Id. at 1369.

AO72A
(Rev. 8/82)

removed.  (Tr. 207).  Dr. Coker noted that the Plaintiff had mild effusion[10], and "[was] getting

out to about -5 degrees full extension at [that] time which [was] a significant improvement from

the original evaluation." (Tr. 207).

On July 10, 2007, Plaintiff visited Dr. Raben, and Dr. Gary Jones at Washington

Regional Medical Center.  (Tr. 272-74, 366).  Dr. Jones examined Plaintiff's fractured ankle and

noted that "[p]atient's plate and screws are seen fixating a fibular fracture.  Screws are seen

fixating an old tibial fracture.  There is some osteoporosis." (Tr. 366).  Dr. Raben indicated that

Plaintiff was experiencing right leg pain, and was still using crutches to ambulate.  (Tr. 272-74).

Dr. Raben noted that Plaintiff's gait appeared normal, and that Plaintiff was in mild distress.  (Tr.

272-74).

On August 3, 2007, Plaintiff saw Dr. Coker at Ozark Orthopaedics for a right knee

evaluation. (Tr. 206).  Dr. Coker noted that Plaintiff was using one crutch to ambulate, although

he recommended switching to "a cane and see how that works. . . ." (Tr. 206).

On August 14, 2007, Plaintiff saw Dr. Jelinek at Washington Regional Medical Center

for an examination of her right ankle, as well as an examination of her spine.  (Tr. 367-68).

Plaintiff also saw Dr. Raben.  (Tr. 268-71).  At the visit with Dr. Raben, Plaintiff indicated that

she was having pain in her ankle and lumbar spine.  (Tr. 268-71).  Dr. Raben stated that Plaintiff

was complaining more of her upper back than her leg.  (Tr. 268).  Dr Raben noted:

> [plaintiff] is getting fairly good extension of her knee now.  She has been
> working with physical therapy for an extended period of time.  I noticed some
> subtalar arthritis as well [as] decreased joint space of the ankle itself, however,
> her plain films show good position of the fracture fragments and mortise.

(Tr. 268).  Dr. Raben indicated that Plaintiff's gait was "crutch walking," and Plaintiff's distress

---

[10]Effusion: the escape of fluid into a part or tissue, as an exudation or a transudation.  Id. at 603.

was non-existent to mild. (Tr. 270).

The impression given by Dr. Jelinek on August 14, 2007, was "healed fractures of tibia and fibula with internal fixation," although he noted some demineralization. (Tr. 367). Dr. Jelinek viewed the x-ray of Plaintiff's lumbar spine and could not identify the cause of her pain. (Tr. 368). The impression given by Dr. Jelinek was a "negative examination." (Tr. 368).

On August 16, 2007, Plaintiff was seen by Mr. Floyd, for a physical therapy evaluation of her back. (Tr. 264-66). Plaintiff mentioned that her back had begun bothering her several months prior, and had been getting worse. Plaintiff noted that "standing and walking [hurt] her back." (Tr. 264). Mr. Floyd noted in his assessment that:

> [p]atient is demonstrating symptoms congruent with diagnosis including lumbar spine mobility, decreased lumbar spine stabilization strength, decreased lower extremity functional strengths, decreased lower extremity flexibility, decreased postural maintenance, decreased body mechanic maintenance, diagnosis related pain all contributing to decreased functional performance with work activities, recreational activities, activities related to daily living, household activities. Patients lumbar spine pain is directly related to her inability to move and walk without deviations secondary to the problems in her leg so to address her lumbar spine pain we will need to normalize[] the use of her right lower extremity.

(Tr. 265). Plaintiff reported to Mr. Floyd that sitting improved symptoms in her back for a short time, her right leg was numb from the mid-shin to the foot, and she was still walking with a cane. (Tr. 264).

On September 4, 2007, Plaintiff saw Dr. Raben for right knee pain, right ankle pain, and back pain. (Tr. 254-57). Pertaining to Plaintiff's lower back, Dr. Raben noted the possibility of some instability, and "an acutely angled sacral[11] fracture that is old in nature." (Tr. 254). As a result of these findings, Dr. Raben ordered a MRI of her lumbar spine. (Tr. 254). Dr. Raben

---

[11]Sacral: pertaining to or situated near the sacrum. Id. at 1687. The sacrum is the triangular bone just below the lumbar vertebrae. Id.

diagnosed Plaintiff with lumbar spine disc degeneration, and lumbar spine disc herniation. (Tr. 256). Plaintiff was still ambulating with a cane, and appeared to be in mild to moderate distress. (Tr. 255-56).

On September 18, 2007, Plaintiff saw Dr. Coker at Ozark Orthopaedics for a right knee evaluation. (Tr. 205). Dr. Coker opined that Plaintiff showed some progress, although she still had problems getting her knee fully extended, and that the knee would get "quite tight" after about minus five degrees of full extension. (Tr. 205). Dr. Coker recommended a dynamic knee brace, and mentioned that a "scope" would not help with the problem at that point. (Tr. 205).

On September 25, 2007, Plaintiff saw Dr. Raben complaining of back and ankle pain. (Tr. 245-48). Dr. Raben noted that Plaintiff was not approved by workers compensation for the MRI of her lumbar spine, and as a result did not have it done. (Tr. 245). Dr. Raben noted that Plaintiff had a reduced range of motion in her spine, ribs, and pelvis, and "some flexion deformity. . . about the knee." (Tr. 247).

On September 28, 2007, Plaintiff had a MRI of her right knee performed at Ozark Orthopaedics, by Dr. Jennifer Turner. (Tr. 211-12). Dr. Turner found:

> [b]oth anterior and posterior cruciate ligaments are intact. The medial and lateral collateral ligaments also appear to be within normal limits. Findings suspicious for some minimal to very mild bone marrow edema changes are seen involving the anterior medial aspect of the right knee. Quadriceps and patellar tendons are both intact. Small joint effusion is seen. There is a hint of an incomplete horizontal tear seen involving the posterior horn of the medial meniscus. The patella is normal in location without evidence of subluxation. No significant cartilaginous defects are noted. No soft tissue or focal bone lesions are identified.

(Tr. 211-12).

On October 11, 2007, Plaintiff saw Dr. Coker at Ozark Orthopeadics for an evaluation

-10-

of her right knee, and to go over the findings of the MRI taken on September 28, 2007.  (Tr. 204).  Dr. Coker viewed the MRI and noted:

> MRI shows no evidence of the osteochondral defect lesion of the knee.  Shows no evidence of meniscal tears.  No intra-articular abnormalities.  It says a questionable tear of the meniscus but in looking at it, I don't think that's the case.  She does have a little bit of edema in the proximal tibia but again, I don't think that has to do with the discomfort and the stiffness that she has. . . .

 (Tr. 204).  Dr. Coker also opined that "[n]o surgical intervention is necessary at this time unless things change, I don't think it will."  (Tr. 204).

On October 30, 2007, Plaintiff saw Dr. Raben, who noted that Plaintiff's back pain may be overtaking her leg pain at this time.  (Tr. 230-33).  Dr. Raben noted that Plaintiff had a reduced range of motion and tenderness in her spine, ribs and pelvis, she was using a dynamic knee brace, and she was in mild distress.  (Tr. 231-32).  Dr. Raben diagnosed Plaintiff with lumbar spine disc degeneration, lumbar spine disc herniation, and fractures of the tibula and fibula.  (Tr. 232).

On November 26, 2007, Plaintiff saw Dr. Coker at Ozark Orthopaedics for an evaluation of her right knee.  (Tr. 203).  Dr. Coker noted that Plaintiff was "still having problems with a flexion contracture of the knee," although mild at approximately five degrees.  (Tr. 203).  Dr. Coker recommended continuing with the bracing, and strengthening exercises.  (Tr. 203).

On December 11, 2007, Plaintiff saw Dr. Raben, complaining of back pain.  (Tr. 215-18).  At that time, Dr. Raben noted that Plaintiff had reached maximum medical intervention.  Dr. Raben provided an overall impairment rating as follows:

> Partial permanent impairment for this according to the Arkansas modification of the guidelines permanent impairment which is for table 36 would show a moderate impairment of 20% of her body as a whole for gait and 2% of her body

-11-

as a whole for loss of cartilage about her ankle which would also rate her at 5% for her lower extremity and 7% for her foot.  Overall impairment rating according [to the] combined table would be 22%

(Tr. 215).  Dr. Raben diagnosed Plaintiff with lumbar spine pain, and lumbar spine radiculitis.[12]

On January 9, 2008, Dr. Robert Redd completed a Physical Residual Functional Capacity Assessment (RFC) for the Plaintiff.  (Tr. 371-78).  Dr. Redd found that Plaintiff could occasionally lift and/or carry ten pounds, frequently lift and/or carry less than ten pounds, stand and/or walk at least two hours in an eight-hour work day, sit about six hours in an eight-hour work day, and push and/or pull an unlimited amount of time, other than as shown for lift and/or carry restrictions.  (Tr. 371-78).  Dr. Redd noted that Plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 373).  Dr. Redd noted no communicative or environmental limitations. (Tr. 375).  Dr. Redd commented that Plaintiff had a persistent mild 5 degree flexion contracture of the right knee and used a cane.  He did not feel that further surgical intervention was warranted at this time.  Plaintiff's deep tendon reflexes and gait were normal.  (Tr. 378).  On May 9, 2008, Dr. David L. Hicks reviewed this RFC assessment and affirmed the findings.  (Tr. 381).

On January 10, 2008, Plaintiff had a "lumbar spine MRI without contrast" performed at Northwest Arkansas Medical Imaging, Inc., by Dr. Douglas E. Elliott.  (Tr. 418).  Dr. Elliott's impression stated there was no MRI evidence of the source of Plaintiff's pain.(Tr. 418).

On January 11, 2008, Plaintiff saw Dr. Raben for a follow-up of the MRI of her lumbar spine, and  Dr. Raben noted that the MRI showed a completely normal study. (Tr. 414-16).  He believed Plaintiff had reached maximum medical intervention, and thought Plaintiff could be

---

[12]Radiculitis: inflammation of the root of a spinal nerve.  Id. at 1595.

released to sedentary work. (Tr. 414). Dr. Raben also noted "some knee lag extension," and that Plaintiff was in no distress. (Tr. 416). Dr. Raben authorized Plaintiff's return to work with restrictions. (Tr. 416).

On January 29, 2008, Plaintiff saw Dr. Coker at Ozark Orthopaedics, who performed an impairment rating, and agreed with Dr. Raben that Plaintiff had reached her maximum medical intervention. (Tr. 417). Dr. Coker's rating was as follows:

> [Plaintiff's] [i]mpairment rating is based on passive range of motion of the right knee and is based on the AMA Guides of Evaluation of Permanent Impairment Fourth Edition. She[, as stated above[,] did have a tibia fracture as well that I believe has gone on to heal well. The fracture is well aligned and therefore there is no impairment due to the fracture. Based on her motion of her knee which shows excellent flexion past 120 degrees but she does have loss of extension. She has a flexion contracture of approximately 6 or 7 degrees which, based on impairment of the knee due to motion, signifies a mild impairment which equivocates to a 10 percent impairment rating for the lower extremity and 4 percent for the whole person. She has no instability of the knee with varus/valgus stresses or AP stresses.

(Tr. 417). Dr. Coker opined that Plaintiff would likely see no further improvement in her motion, and that the pain in her knee was consistent with patellofemoral syndrome.[13] (Tr. 417).

On April 1, 2008, Plaintiff saw Dr. Raben for a follow-up appointment. (Tr. 382-85). Since the last visit with Dr. Raben, Plaintiff reported that her knee had given way, and that she was having numbness in her right buttock. (Tr. 382). Plaintiff was ambulating with a cane, and Dr. Raben noted exaggerated antalgic gait, and a "tearful mood and affect." (Tr. 384).

On June 3, 2008, Plaintiff sought assistance from Ozark Guidance, Inc., for an emergency visit. (Tr. 423-24). Plaintiff saw Dr. Travis W. Jenkins and an employee of Ozark Guidance, Inc., Kristen Speer. (Tr. 423024). Dr. Jenkins opined that Plaintiff was depressed and, as a

---

[13]Patellofemoral syndrome: anterior knee pain due to a structural or functional disturbance in the relation between the patella and distal femur. Stedman's Medical Dictionary 1908 (28th ed. 2006).

AO72A
(Rev. 8/82)

result, proscribed her Fluoxetine.  (Tr. 423).  Ms. Speer noted that Plaintiff was crying excessively and felt worthless, and she was having suicidal thoughts but reported that she will not act on them.  (Tr. 424).

On June 17, 2008, Plaintiff returned to Ozark Guidance, Inc. for a follow up appointment. (Tr. 421-22).  Barbra Wise-Doyle, a licensed professional counselor, noted that Plaintiff:

> is living with a guy and takes care of the house and his kids while he travels for his job.  [Plaintiff] said it is a job and gives her a place to live with her kids. [Plaintiff] said she has three kids of her own and he has 3 and the job is very nerve wrecking but she is managing.

(Tr. 421).  Dr. Ardell William Diessner, Staff Psychiatrist at Ozark Guidance, Inc., noted that Plaintiff's depression had been lifting, and  Plaintiff reported  feeling a little better.  (Tr. 422).

On July 29, 2008, Plaintiff saw Dr. Christopher A. Arnold at Arnold Orthopaedic and Sports Medicine, for right knee pain.  (Tr. 404-05).  Dr. Arnold noted that Plaintiff had "some disuse osteoporosis" in her right knee.  (Tr. 404-05).  Dr. Arnold gave the impression that there was "[r]ight knee pain after a work-related injury with significant flexion contracture, possible chondral defect and possible medial meniscus tear."  (Tr. 405).

On August 24, 2008, a MRI was performed by Dr. Jarret D. Sanders at Washington Regional Medical Center of Plaintiff's right knee.  (Tr. 408).  Dr. Sanders reported the following findings: "[t]he menisci and articular cartilage are normal.  The cruciate and collateral ligaments are intact.  The extensor mechanism is normal.  A small air fluid is seen within the joint space. No loose bodies are identified.  No Baker's cyst is seen."  (Tr. 408).

On October 14, 2008, Plaintiff saw Dr. Arnold, who noted that "[Plaintiff's] MRI was negative but I am concerned she has a chondral defect."  (Tr. 389-94).  At that visit, Plaintiff and

-14-

Dr. Arnold agreed that a "scope" of the right knee may be the best option.  (Tr. 390-91).

On November 26, 2008, Plaintiff was seen by Dr. Michael W. Morse at Neurological

Associates, PLC.  (Tr. 386-87).  Dr. Morse gave the following impression:

> [r]ight lower extremity atrophy after a distal fracture of the tibia and fubula.  She
> has a decreased right knee jerk and atrophy of both the thigh and the lower leg.
> She has a 2 cm difference in both the thigh and the calf being smaller on the right
> than the left.  She does have some difficulty walking on her heel and toe with the
> right leg.  She has an antalgic gait.  There is a little bit of difficulty walking stairs.

(Tr. 387).  Dr. Morse recommended an Plaintiff undergo an EMG/nerve conduction study to

evaluate the atrophy.  (Tr. 387).

On December 8, 2008, Plaintiff again saw Dr. Morse to discuss the findings of the

EMG/nerve conduction study.  (Tr. 397-99).  Dr. Morse noted that the tests came back normal,

and he could provide no explanation for Plaintiff's right leg atrophy.  (Tr. 397).

On April 14, 2009, Plaintiff saw Dr. Charles E. Pearce at Arkansas Specialty

Orthopaedics for an evaluation of her right knee.  (Tr. 419-20).  Dr. Pearce noted that Plaintiff

"will not be able to return to her work as a tree surgeon," and that Plaintiff had reached

maximum medical improvement.  (Tr. 419-20).  Dr. Pearce noted some diffuse osteoporosis in

Plaintiff's right knee, a "broad based gait," and ankle and knee arthrofibrosis.  (Tr. 419-20).  The

findings of Dr. Pearce were consistent with previous examinations, especially pertaining to

Plaintiff's flexion contracture.  Dr. Pearce agreed with the permanent partial impairment given

by Dr. Raben and Dr. Coker.  (Tr. 419).

On July 21, 2009, Plaintiff saw Dr. Arnold for an examination of her right knee.  (Tr.

429-30).  Both Dr. Arnold and Plaintiff agreed that a "scope" was the best course of action.  (Tr.

429-30). Generally, there had been little improvement in her right knee.

On October 30, 2009, Plaintiff saw Dr. Arnold at Physicians Specialty Hospital for a right knee arthoscopy.  (Tr. 426-28).  The postoperative diagnosis indicated a "[r]ight knee chondral defect of the patella, medial femoral condyle with large loose body approximately 1 x 1 cm with slight flexion contracture of the knee."  (Tr. 426).  The arthoscopic findings were:

> Grade 3 chondral changes about the patella.  Trochlea was soft but intact.  Medial gutter clear.  She has grade 3 chondral change about most anterior portion of the medial feloral condyle.  She had a large grade 4 chondral defect about the most posterior aspect of the medial femoral condyle in an area measuring 1.5 by 1.5 cm.  She had a large loose body.  It was all articular cartilage 1 cm x 1 cm.  Medial meniscus intact.  Medial tibial plateau intact.  ACL and PCL were intact.  Lateral meniscus and lateral femoral condyle intact.  Lateral gutter clear.

(Tr. 426).

From February 20, 2007 to April 26, 2007, Plaintiff was scheduled to attend approximately fourteen physical therapy appointments with Waymon Floyd.  (Tr. 278-79, 287-88, 290-92, 294-97, 301-08). Plaintiff only attended approximately seven of these appointments.  (Tr. 278-79, 287-88, 290-92, 294-97, 301-08).  The notes of the appointments indicated that Plaintiff was showing slight objective improvements following treatment, and her pain was less following treatment.   (Tr. 278-79, 287-88, 290-92, 294-97, 301-08).

From around April 20, 2007 to August 3, 2007, Plaintiff was attending physical therapy at Ozark Orthopaedics.  (Tr. 206-10).  The record indicates that Plaintiff attended physical therapy at that time about three times a week.  (Tr. 206-10).

From August 15, 2007 to December 6, 2007, Plaintiff began using the physical therapy services of Waymon Floyd again.  (Tr. 219-23, 225, 227-29, 235-44, 249-53, 258-67).  Plaintiff was scheduled to attend approximately thirty-two appointments during this time, of which she attended twenty-three.  (Tr.  219-23, 225, 227-29, 235-44, 249-53, 258-67).  Plaintiff, through

-16-

physical therapy, was showing slight objective improvements, and her pain was generally less following treatment.  (Tr.  219-23, 225, 227-29, 235-44, 249-53, 258-67).

Plaintiff sought physical therapy on three occasions from September 9, 2008 to September 23, 2008 from Arnold Orthopaedics.  (Tr. 395).  The physical therapy notes for these sessions indicated a very mild change, if any.  (Tr. 395).

### III.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and prevents her from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d)(3), 1382(3)(c).  A Plaintiff must

-17-

show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) Whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. §§ 404.1520, 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**IV.   Discussion:**

Plaintiff contends that the ALJ erred in not properly assessing: (1) the combined effect of Plaintiff's impairments, including Plaintiff's mental impairments; (2) Plaintiff's credibility and subjective complaints; and (3) Plaintiff's residual functional capacity.

**A.  Combined Effect of Plaintiff's Impairments:**

The ALJ must make a determination at step two whether the Claimant has a medically determinable impairment that is severe or a combination of impairments that is severe. 20 C.F.R. §§ 404.1520 (c), 416.920(c). An impairment is severe within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. §§ 1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or combination of impairments is not severe

-18-

when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. §§ 404.1521, 416.921. The Supreme Court has adopted a "de minimis standard" with regard to the step two severity standard. Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cir. 1989). "Only those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits [at step two]." Bowen v. Yuckert, 482 U.S. 137, 158 (1987) (O'CONNOR, J concurring).

The ALJ determined that the Plaintiff suffered from the severe impairments of "status post broken leg and status post fractured tail bone." (Tr. 52). The ALJ found that other alleged disabilities "have not been shown to have caused more than minimal restriction on the claimant's ability to perform work-related activities and are thus considered nonsevere impairments." (Tr. 52).

The undersigned finds that the ALJ properly determined Plaintiff's impairments or combination of impairments did not medically equal a listed impairment. The ALJ consistently stated that the combination of impairments was being taken into consideration, which is sufficient to show substantial evidence in support of the ALJ. Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994). For instance, the ALJ stated "The medical evidence does not document listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, *individually or in combination*." (Tr. 51)(emphasis added). Further, the ALJ recognized that disability is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment *or combination of impairments* . . . ."(Tr. 49)(emphasis added). The ALJ stated that when determining a RFC

-19-

"the [ALJ] must consider *all of the claimant's impairments, including impairments that are not severe*." (Tr. 50)(emphasis added).   In addition, the ALJ reiterated that he had taken the impairments in combination by stating "the [ALJ] finds that the claimant's medically determinable *impairments* could reasonably be expected to cause the alleged symptoms. . . ." (Tr. 53)(emphasis added).  The ALJ consistently mentioned throughout the opinion that a combination of impairments must be taken into consideration.   Accordingly, the undersigned finds that substantial evidence indicates that the ALJ did take all impairments and combination of impairments into consideration when determining Plaintiff's disability status.

Regarding Plaintiff's mental disability, the ALJ's determination that Plaintiff's alleged mental disability constituted a nonsevere impairment is supported by substantial evidence in the record.  First, Plaintiff only sought specialized treatment for mental problems on two occasions, June 3, 2008 and June 17, 2008.  (Tr. 421-423).  On the second visit, evidence indicated that Plaintiff stated "I'm beginning to feel a little better." (Tr. 422).  Dr. Diessner, opined on this second visit that her "[d]epression seems to be lifting a little bit with the Fluoxetine." (Tr. 422). See Kisling v. Chater, 105 F.3d 1255, 1257 (finding that impairments that are controllable or amenable to treatment do not support a finding of disability).   There is no evidence in the record that after this second visit Plaintiff sought further mental health treatment.  See Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) ("While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem).  Plaintiff testified at the hearing in May, 2009, that she had "bouts of depression," which was inconsistent with the allegation of a severe impairment.  (Tr. 21).  Plaintiff provided no evidence that her mental impairments caused any functional limitation on her ability to work.

Plaintiff's original application for disability insurance benefits alleged the illnesses, injuries, or conditions that limit work as "[l]eg broken and tail bone, knee is bad, I have alot [*sic*] of pain in my back." (Tr. 123). The fact that Plaintiff did not allege depression or any mental disability on her original application is a significant factor in determining whether this alleged impairment is, in fact, severe. Page v. Astrue, 484 F.3d 1040, 1044 (8th Cir. 2007); Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001)("The fact that [Plaintiff] did not allege depression in her application for disability benefits is significant, even if the evidence of depression was later developed.")(citing Smith v. Shalala, 987, F.2d 1371, 1375 (8th Cir. 1991).

Accordingly, the undersigned finds that there was substantial evidence to support the findings of the ALJ regarding categorizing Plaintiff's alleged mental impairment as nonsevere.

**B.       Subjective Complaints and Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, and ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003).

After reviewing the administrative record, it is clear that the ALJ properly evaluated

-21-

Plaintiff's subjective complaints.  Although Plaintiff contended that her arthrofibrosis, hip pain, lumbar spine disc degeneration and lumbar spine disc herniation were severely disabling, the evidence of record does not support this conclusion.

The ALJ specifically states "the [ALJ] has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R.§ § 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (Tr. 52).  Although not specifically citing Polaski, the ALJ took the factors of 20 C.F.R § 404.1529 and 416.929 into consideration, which largely mirror the Polaski factors.  (Tr. 52).  See Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007).  Therefore, specifically citing Polaski is not required, and an ALJ need not discuss each Polaski factor.  Id.; Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996).  Furthermore, a relevant factor when determining a claimant's subjective complaints is the absence of objective medical evidence in support of the claims.  Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).  It is sufficient if the ALJ acknowledges and considers the Polaski factors before discounting a claimant's subjective complaints.  Id.  "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth."  Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).

With regard to the credibility of the allegations made by the Plaintiff, The ALJ specifically mentioned:

> While the claimant alleged serious impairment both around the time she filed for disability, in late 2007, and in the hearing in May of 2009, she nonetheless took care of a house and 6 kids in at least part of 2008.  In fact, records from Ozark Guidance Center, dated June 17, 2008, indicate that the claimant was living with a guy and 'takes care of the house and his kids while he travels for his job.' The

-22-

records further noted that she 'said it was a job and gives her a place to live with her kids.'

(Tr. 52).  The ALJ specifically mentioned that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with [the ALJ's] residual functional capacity assessment."  (Tr. 53).

The Plaintiff had repeatedly indicated that she had extreme trouble doing household chores.  For instance Plaintiff stated "I can't be on my feet, sit or stand for very long at all." (Tr. 123).  Plaintiff indicated that she needed the assistance of a bar in the bathroom to get in and out of the shower, and that she could lift the laundry, but not carry it because she has a hard time walking. (Tr. 25-26).   All of these statements are inconsistent with the ability to take care of six children.  Accordingly, the undersigned finds that the fact that the ALJ discredited Plaintiff's statements regarding subjective complaints was supported by substantial evidence.

Regarding the lack of objective medical evidence to support the subjective claims, the ALJ noted:

> [t]he claimant in this case underwent numerous tests such as magnetic resonance imaging (MRI), x-rays, and other tests.  These findings produced fairly consistent results.  For example, the claimant had at least three MRI's conducted on her right knee since her September 2006 injury.  The results of those MRI's were either normal, as on the most recent occasion, or included language such as mild, questionable, and no significant abnormalities, in addition to other apparently minor findings.

(Tr. 53).  The ALJ then listed instances of both good and bad objective results, including the lack of objective medical evidence to support complaints of back pain, the fact that the initial injury had healed well, and that other tests were performed where the results had been within normal limits. (Tr. 53).  The ALJ considered many tests conducted on Plaintiff, nearly all of which

-23-

provided no objective results to the source of Plaintiff's pain. The lack of objective medical evidence, in addition to the discredited testimony of Plaintiff, all support the credibility findings of the ALJ.

The undersigned finds that the ALJ provided good reason for discrediting Plaintiff's subjective complaints of pain, and are thus supported by substantial evidence. Further, the undersigned finds that the ALJ did take into consideration the "Polaski" factors.

**C.    RFC Assessment:**

We next turn to the ALJ's assessment of plaintiff's RFC. RFC is the most a person can do despite that person's limitation. 20 C.F.R. § 404.1545(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In the present case, the ALJ considered the medical assessments of examining agency medical consultants, Plaintiff's subjective complaints, and other evidence of record. (Tr. 53). The ALJ specifically mentioned that he had taken "state agency determinations" into

-24-

consideration, including the RFC assessment given by Dr. Robert Redd.  (Tr. 53).  Dr. Redd

indicated that Plaintiff could occasionally lift and/or carry ten pounds, frequently lift and/or carry

less than ten pounds, stand and/or walk at least two hours in an eight-hour work day, sit about six

hours in an eight-hour work day, and push and/or pull an unlimited amount of time, other than

as shown for lift and/or carry restrictions.  (Tr. 371-78).  Dr. Redd noted that Plaintiff could

occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 373).  This RFC

assessment was subsequently affirmed by Dr. David L. Hicks.  (Tr. 381).

The ALJ specifically mentioned taking "other evidence of record into consideration."(Tr.

53).  "For example, Dr. Charles Pearce, M.D., agreed with the claimant's treating physician, Dr.

Cyril Raben, in determining that the claimant can return to work at the sedentary level." (Tr. 53).

Furthermore, the ALJ noted that these findings were not inconsistent with the findings of Dr.

Coker.  (Tr. 53).  "Dr. Coker noted in part that the claimant had a 'mild impairment which

equivocates to a 10 percent impairment rating for the lower extremity and 4-percent for the whole

person.'"(Tr. 53).  The ALJ noted that "these findings are consistent with the evidence of record

generally."  (Tr. 53).

The ALJ also took other tests performed on the Plaintiff into consideration, including

MRI's, x-ray's, and other tests.  (Tr. 53).  The ALJ noted that these tests generally included

"language such as mild, questionable, and no significant abnormalities, in addition to other

apparently minor findings."  (Tr. 53).  The ALJ noted that at least one x-ray had found some

disuse osteoporosis, and the Plaintiff had range of motion problems with her knee.  (Tr. 53).

After reviewing the evidence of record, we find the ALJ's RFC findings were supported

by substantial evidence.  Dixon v. Barnhart, 353 F.3d 602, 606 (8th Cir. 2003) (medical opinions

-25-

of a treating physician are normally accorded substantial weight, but they must not be inconsistent with other evidence on the record as a whole).  Based on the entire evidence of record, the undersigned finds substantial evidence to support the ALJ's RFC findings.

**V.      Conclusion**:

Based on the foregoing, the Court affirms the ALJ's decision, and dismisses Plaintiff's case with prejudice.

DATED this 23rd day of December 2011.

/s/ *Erin L. Setser*
_____

HON. ERIN L. SETSER

UNITED STATES MAGISTRATE JUDGE

-26-